■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FREDERICK MILLER, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (Meyerson, J.), rendered February 20, 1985, convicting him of murder in the second degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of those branches of the defendant's omnibus motion which were to suppress inculpatory statements and identification testimony.

Ordered that the judgment is reversed, on the law and the facts, the plea is vacated, those branches of defendant's omnibus motion which were to suppress Maurice Fitzgerald's identification testimony and the defendant's statement regarding the location of the guns used in the commission of the crime

and his precinct confession to Detective Hickey are granted, and the matter is remitted to the Supreme Court, Kings County, for further proceedings.

On April 24, 1984, at approximately 8:45 P.M., the defendant and his codefendant Gregory Leftwich, disguised with ski masks, forcibly took, at gunpoint, a radio from Louis Ortiz and two other persons standing in front of 233 Sands Street, in Brooklyn. During the robbery, Ortiz rushed the defendant, who then shot and killed Ortiz. Maurice Fitzgerald informed Detective Hickey that he heard a shot emanate from the front of 233 Sands Street and observed the codefendant Leftwich, whom he called "Monse", running from the crime scene with a radio on his shoulder. Running behind Monse was another taller person, wearing a ski mask. After Leftwich was arrested and made a statement implicating the defendant in the robbery and felony murder, Detective Hickey and two other detectives went to the apartment of the defendant's mother. The mother admitted the detectives and, upon being informed about the investigation, summoned the defendant to come home. When the defendant entered the apartment, he was informed of the charges and the results of the investigation, and was asked to accompany the detectives to the station house. At that point, the defendant's mother, who had expressed disbelief regarding her son's alleged involvement, stated that her son was not going anywhere and that she wanted to speak with him. The mother asked the defendant what he had done. In the presence of the officers, the defendant made an incriminating statement disclosing his role in the robbery and felony murder. Upon overhearing the defendant's confession, Detective Hickey asked the mother if the guns used by the defendant and his cohort were still in the apartment. The mother relayed the inquiry to her son, who stated the guns were given to Shandu. Before transporting the defendant to the police precinct, the defendant agreed to show the officers the location of Shandu's apartment. After accompanying the officers to Shandu's apartment, the defendant was then transported to the police precinct, where he was first advised by Detective Hickey of his *Miranda* rights. He waived his rights and was interrogated by Detective Hickey. The defendant again confessed his participation in the robbery and felony murder of Ortiz. Approximately four hours later, the defendant made two videotaped statements to an Assistant District Attorney after being readvised of his *Miranda* rights.

On the date of their arrest, Fitzgerald identified both the defendant and the codefendant Leftwich at a showup con-

ducted at the precinct. Prior to viewing each defendant separately through a one-way mirror, Fitzgerald furnished Detective Hickey with their first and last names and informed the detective that he had known both defendants from junior high school and from the neighborhood for at least the past couple of years.

The defendant contends that the hearing court erred in denying that branch of his motion which was to suppress the identification by Maurice Fitzgerald. We agree.

A recognized exception to the general rule that showups are inherently suggestive *(see, Stovall v Denno,* 388 US 293; *People v Lane,* 102 AD2d 829, *appeal dismissed* 63 NY2d 865) exists where the witness recognized the perpetrator at the time of the commission of the crime and the basis for that recognition was the fact the witness knew the perpetrator prior to the commission of the offense. In such situations, the showup is in the nature of a confirmation, rather than an identification *(see, People v Tas,* 51 NY2d 915; *People v Gissendanner,* 48 NY2d 543; *People v Fleming,* 109 AD2d 848; *People v Laguer,* 58 AD2d 610). The People had the initial burden *(see, People v Jackson,* 108 AD2d 757; *People v Jones,* 112 AD2d 952, *lv denied* 66 NY2d 615) to come forward with sufficient evidence that the showup procedure was confirmatory in nature. While Fitzgerald's viewing of the codefendant Leftwich, also known as "Monse", was clearly confirmatory *(see, People v Leftwich,* 134 AD2d 371), the People failed to meet their burden with respect to the defendant in the absence of any proof that Fitzgerald recognized him as one of the masked perpetrators prior to the showup.

We reject the defendant's contention that the inculpatory statement he made to his mother, disclosing his role in the robbery and felony murder, should have been suppressed on the ground it was obtained by an agent of the police in violation of his *Miranda* rights. It is axiomatic that the constitutional protections against self-incrimination do not apply to confessions elicited by private individuals *(People v Horman,* 22 NY2d 378, *cert denied* 393 US 1057; *People v Warren,* 97 AD2d 486, *appeal dismissed* 61 NY2d 886). However, actions of private individuals do become subject to scrutiny for violations of constitutional limitations when those individuals act as agents of the government or when government officials participate in those actions *(see,* CPL 60.45 [2] [b]; *People v Ray,* 65 NY2d 282; *People v Jones,* 47 NY2d 528; *People v Esposito,* 37 NY2d 156; *People v Warren, supra).* Although the defendant was undisputedly in custody at the

time of his first inculpatory statement, the record does not support the inference that his mother was acting as an agent of the police when she demanded to speak with her son before the detectives transported him to the station house. She was not acting either at the direction of or in cooperation with the police when she initially asked the defendant to tell her what he had done (see, People v Graham, 120 AD2d 674, lv denied 68 NY2d 757; People v Peoples, 117 AD2d 977, lv denied 67 NY2d 948; People v Bracy, 98 Misc 2d 346, affd sub nom. People v De Pasquale, 75 AD2d 751, affd 54 NY2d 693; see also, Matter of C.P.D., 367 A2d 133 [DC App]; State v Thompson, 287 NC 303, 214 SE2d 742, vacated in part on other grounds 428 US 908). Since the defendant's statement to his mother divulging his active participation in the crimes was not given in response to interrogation by the police or their agent and there is nothing in the record to suggest that it was in any way involuntarily obtained as a result of compulsion, the hearing court correctly denied that branch of the defendant's omnibus motion which was to suppress it. We note, additionally, that the defendant did not raise at the suppression hearing or on appeal any contention that his statement was inadmissible as violative of the parent-child privilege (see, People v Harrell, 87 AD2d 21, affd 59 NY2d 620). Consequently, that issue has not been preserved for appellate review.

Unlike the defendant's initial incriminating confession, his responses to questions regarding the location of the guns used by him and his cohort in the commission of the crime should have been suppressed since he had not been advised of his Miranda rights. When Detective Hickey asked the defendant's mother if the guns were in the apartment, he should reasonably have anticipated that the mother would merely relay the inquiry to her son and, thus, evoke a statement from the defendant, as evidenced by the fact the mother had cooperated with the detectives by summoning the defendant home and by the defendant's demonstrated responsiveness to his mother's initial inquiries (see, People v Lynes, 49 NY2d 286, 295; People v Aguanno, 125 AD2d 579, lv denied 69 NY2d 876; People v Bryant, 87 AD2d 873, 874, affd 59 NY2d 786, rearg dismissed 65 NY2d 638). At that time, the private conduct of the mother became "so pervaded by governmental involvement that it los[t] its character as such and invoke[d] the full panoply of constitutional protections" (People v Ray, 65 NY2d 282, 286, supra).

Although the defendant was advised of his Miranda warn-

ings at the police precinct before making his second confession in response to Detective Hickey's interrogation, that confession should also have been suppressed. *Miranda* warnings must precede the questioning of a defendant. "Later is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" *(People v Chapple*, 38 NY2d 112, 115). Here, there was an insufficient hiatus between the defendant's responses to questions concerning the whereabouts of the guns used in the commission of the offense and the location of Shandu's apartment and his confession at the precinct to Detective Hickey to dispel the taint of the improper initial interrogation, particularly in view of the detective's active role in both interrogations *(see, People v Newson*, 68 AD2d 377). Nevertheless, the defendant's videotaped statements to the Assistant District Attorney, made after being readvised of his *Miranda* warnings and following a hiatus of approximately four hours, are admissible, as the defendant had ample time for reflection, thus resulting in his return to the status of one who was not under the influence of questioning *(see, People v Mahoney*, 122 AD2d 815, *lv denied* 68 NY2d 1002; *cf., People v Johnson*, 79 AD2d 617). Thompson, J. P., Rubin, Eiber and Sullivan, JJ., concur.